IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| MAUREEN BORELLI,<br><br>        PLAINTIFF,<br><br>v.<br><br>SINTETICA US, LLC,<br><br>SINTETICA, SA, and<br><br>FRANK MULLERY,<br><br>        DEFENDANTS. | Civil Action No. _____<br><br>JURY TRIAL DEMANDED |

**COMPLAINT AND JURY DEMAND**

Plaintiff Maureen Borelli, by and through her attorneys, Bell & Bell, LLP, hereby files the following Complaint and Jury Demand ("Complaint").

**PRELIMINARY STATEMENT**

1. This is an action for an award of damages, liquidated damages, attorneys' fees and other relief on behalf of Plaintiff Maureen Ames Borelli ("Ms. Borelli"), a former employee of Sintetica US, LLC, and Sintetica SA (collectively "Sintetica"). Ms. Borelli was retaliated against by Sintetica and President of Sintetica US, LLC, Frank Mullery, for her opposition and refusal to engage in unethical or illegal activity and for her expressed concerns regarding the unethical or illegal activity, resulting in her wrongful termination on or about March 3, 2024.

2. This action arises under the New Jersey Conscientious Employee Protection Act, N.J.S.A. 34:19-1 et seq. and the common law of the State of New Jersey.

**JURISDICTIONAL STATEMENT**

3. This Court has diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332.

4. The amount in controversy in this matter exceeds the jurisdictional minimum of $75,000 exclusive of interest and costs.

5. Plaintiff's damages in this matter are in excess of $150,000, exclusive of interest and costs.

6. The Parties hereto are citizens and/or residents of different states.

7. Plaintiff Maureen Borelli is a citizen and resident of Key West, Florida and the United States of America.

8. Defendant Sintetica US, LLC is a Delaware corporation with its corporate headquarters and principal place of business in Princeton, New Jersey, where Ms. Borelli was employed. Sintetica US, LLC is Sintetica SA's United States based subsidiary.

9. Defendant Sintetica SA is a Swiss company with its corporate headquarters in Mendrisio, Switzerland.

10. Defendant Frank Mullery is a citizen and resident of Pennsylvania and the United States of America.

## VENUE

11. This action properly lies in the District of New Jersey, pursuant to 28 U.S.C. § 1391(b), because the claim arose in this judicial district.

12. This action also properly lies in the District of New Jersey because significant activities associated with the claims alleged took place in this jurisdiction and because Plaintiff was employed and terminated by Defendant in this jurisdiction.

## PARTIES

13. Plaintiff Maureen Borelli is a citizen and resident of Key West, Florida and the United States of America.

14. Defendant Sintetica US, LLC is a Delaware corporation with its corporate headquarters and principal place of business in Princeton, New Jersey.

15. Defendant Sintetica SA is a Swiss company with its corporate headquarters in Mendrisio, Switzerland.

16. Defendant Sintetica SA's website indicates that "[w]e currently market over 250 products globally, with an active pipeline of new ones always on the way" and "[i]n Switzerland, Germany, Austria and the USA our specialized national teams directly sell, promote and market our products." *See https://sintetica.com/strategy*.

17. Sintetica SA directed its actions against Ms. Borelli at Ms. Borelli in the United States, as alleged herein.

18. Defendant Frank Mullery is a citizen and resident of Pennsylvania and the United States of America.

19. At all relevant times, Defendant Sintetica US, LLC is and has been an employer employing more than twenty (20) employees and Defendant Sintetica SA is and has been an employer employing more than two hundred (200) employees.

20. At all relevant times, employees of Sintetica acted as agents and servants for Sintetica.

21. At all relevant times, employees of Sintetica were acting within the scope of their authority and in the course of employment under the direct control of Sintetica.

22. At all times material hereto, Sintetica acted by and through its authorized agents, servants, workmen, and/or employees acting within the course and scope of their employment with Sintetica and in furtherance of Sintetica's business.

23. At all times relevant hereto, Defendants each are and have been "employers" and/or "persons" within the meaning of the laws at issue in this matter, and are accordingly subject to the provisions of said laws.

24. At all relevant times hereto, Plaintiff Maureen Borelli was an "employee" within the meaning of the laws at issue in this matter, and is accordingly entitled to the protections of said laws.

25. This cause of action arose out of transactions or occurrences that took place in whole or in part in Princeton, New Jersey.

26. This Honorable Court has personal jurisdiction over Defendants.

## FACTS

27. Ms. Borelli began her employment with Sintetica as the National Accounts Director for Sintetica US on January 22, 2024.

28. Ms. Borelli's responsibilities included addressing wholesale issues and group purchasing for Sintetica.

29. Prior to her hire, Ms. Borelli interviewed with employees of Sintetica US, but also executives from Sintetica SA.

30. Upon her hire, Ms. Borelli immediately began expanding Sintetica's reach.

31. Among other things, during her employment, despite the short tenure, Ms. Borelli executed five new contracts, with two additional contracts in the process of being finalized, and actively pursued multiple other new opportunities for Sintetica.

32. A mere two days prior to her termination, Ms. Borelli was praised by Mirco Montella, Chief Innovation Officer and Deputy Commercial Officer for Sintetica SA, for her accomplishments.

33. Mr. Montella stated in response to Ms. Borelli's PowerPoint presentation for a sales meeting that "[s]o much has been done already and this is so exciting."

34. Mr. Montella's remarks were in recognition of Ms. Borelli's accomplishments, which would set the foundation for pharmaceutical companies in the U.S. market and bring in sales and profits for Sintetica for years to come.

35. Ms. Borelli was an accomplished employee in spite of the poor leadership and management exhibited by Frank Mullery, President of Sintetica US.

36. At the time of Ms. Borelli's hire, Mr. Mullery had been the President of Sintetica US for approximately one-and-a-half years, but early on in her employment, Ms. Borelli became aware of the fact that Sintetica US was far behind in actual sales compared to expectations.

37. The sales number for the first quarter of Ms. Borelli's employment was extremely high.

38. Ms. Borelli immediately proved herself to be a valuable employee to Sintetica by opening one wholesaler with two more in process.

39. Mr. Mullery then proposed to divide the quarterly number among the wholesalers by engaging in "channel stuffing" – a method that is well-known to be inefficient and ineffective since it is not guaranteed that there will be a demand for a product.

40. Thus, although a company may temporarily hit its sales number by using this tactic, it could have an adverse effect if a lack of demand results in the wholesalers returning the product.

41. Ms. Borelli voiced her concerns with utilizing this practice to Mr. Mullery, stating that it simply would not work.

42. Mr. Mullery, however, continued to pressure Ms. Borelli and said that she needed to align with him on strategy.

43. Despite it being an unreasonable ask, Ms. Borelli demonstrated her tenacity and commitment to collaboration by pursuing a stock order from one of the wholesalers: "Client 1".

44. As a favor, Client 1 put in an order amounting to $3,500 and a second order in the amount of $35,000 on February 26, 2024.

45. While these sale numbers were lower than the $500,000 that Mr. Mullery demanded, they were nevertheless very reasonable and fair given that there was no contract in place with this account.

46. Nonetheless, Mr. Mullery became frustrated and upset with the sales numbers, claiming that they were unacceptable.

47. Mr. Mullery's frustration increased throughout the week, as it became clear that Sintetica US would not be able to meet its first quarter sales numbers.

48. After another wholesaler informed Sintetica US that it would not be setting up an account until later, Mr. Mullery became even more adamant that Ms. Borelli establish new contracts.

49. On February 29, 2024, despite the fact that Mr. Mullery had, until this point, been placing pressure on Ms. Borelli and Sintetica US's sales team to meet the first quarter sales numbers, Mr. Mullery rejected the orders placed by Client 1, claiming that they were "too small."

50. Later that day, Ms. Borelli participated in a virtual meeting with Mr. Mullery and Christine Pepitone, Finance Director.

51. During the meeting, Mr. Mullery said that he devised a plan of stating to "Client 2" that Sintetica US had contracts in place with a group purchasing organization (GPO) even though it did not.

52. Ms. Borelli was astonished by this proposal, as it was a falsification of Sintetica's situation, and stated that they could not take this approach.

53. Mr. Mullery, however, was adamant that Sintetica state that it had contracts with a GPO, arguing that no one would check.

54. Ms. Borelli objected again, saying that Sintetica could not make this claim as it was a misrepresentation and unethical.

55. Ms. Borelli also objected to engaging in this unethical activity as it would damage Sintetica's reputation and ability to conduct business in the United States.

56. In text message exchanges with Ms. Pepitone after the meeting, Ms. Borelli emphasized again that she objected to this unethical activity and would not participate in any way in this ploy, stating, "I am National Accounts and I am not telling [Client 2] we have a GPO contract that we don't have…if [Mr. Mullery] actually asks me to do it, I'm going to have to say no."

57. Ms. Borelli also expressed her concern that she was going to eventually become the scapegoat due to her refusal to engage in unethical activity, writing, "I have a VERY uneasy & uncomfortable feeling right now like I'm going to be the fall guy for this."

58. On or about March 1, 2024, Ms. Borelli received an email from a company that she had contacted on January 29, 2024, "Client 3", that voiced interest in becoming a potential customer.

59. This was the direct result of Ms. Borelli's ability to establish and leverage positive working relationships, as Client 3 was a company with which Ms. Borelli had previously conducted business.

60. Ms. Borelli promptly contacted Mr. Mullery to inform him of this development.

61. Mr. Mullery did not respond until the next day, March 2, 2024.

62. In his email, he simply stated that he wanted to understand more about the company and the value chain and that Ms. Borelli should not stray off the priority list, which was a list of priority accounts that Mr. Mullery had sent to Ms. Borelli on February 14, 2024.

63. This tepid response was unexpected, as Mr. Mullery had thus far been unrelenting with his attempts to push Ms. Borelli to set up new contracts, and Client 3, which was gaining market share in the Institutional Market, provided an opportunity to partner with a company to sell and distribute Sintetica's products.

64. Later that day, Ms. Borelli and other employees from Sintetica, arrived for a conference in Orlando, Florida.

65. On the following day, March 3, 2024, Mr. Mullery and the rest of the team arrived at the conference. Later that day, Ms. Borelli was called down to a table in a restaurant at the conference.

66. When Ms. Borelli arrived, Mr. Mullery, with Mr. Montella also in attendance and nodding his approval, informed her that her employment was being terminated.

67. Mr. Mullery claimed that Ms. Borelli's termination was due to her communicating with Client 3, a nonauthorized customer, and because she had discussed pricing with Client 3 without a nondisclosure agreement (NDA) in place.

68. Ms. Borelli then clarified that she had not in fact discussed any pricing with Client 3, which could be verified by the fact that the email correspondence she had with Client 3 – which she had already shared with Mr. Mullery – did not mention pricing at all.

69. Mr. Mullery then changed tactics, alleging that Ms. Borelli had talked about products with Client 3 without an NDA in place.

70. Ms. Borelli stated that she did send a product list to Client 3, but that all of the information she communicated was public information – it was already featured on Sintetica's website and was the same information that was shared during trade shows.

8

71. Mr. Mullery, recognizing that he had once again fabricated a termination reason that could not be corroborated, chose a final line of attack: that Ms. Borelli had focused on gaining business with a company that was not on Mr. Mullery's priority list of targeted accounts.

72. However, the first day that Ms. Borelli had contacted Client 3 was January 29, 2024, an entire two weeks before Mr. Mullery had even sent her the priority list.

73. Notwithstanding the lack of support with respect to any wrongdoing on the part of Ms. Borelli, Mr. Mullery informed Ms. Borelli that she was terminated effective immediately, and that there was a flight out of Orlando that night or the following day.

74. Notably, Ms. Borelli was terminated a mere three days after she objected to unethical or illegal activity and refused to participate in said activity to misrepresent Sintetica's business.

75. On March 4, 2024, Ms. Borelli sent an email to Sintetica's corporate leadership informing them of the circumstances surrounding her termination, including that Mr. Mullery had asked her to engage in unethical activity, and that she had refused to participate in said activity.

76. Ms. Borelli also detailed the ways in which Mr. Mullery's alleged justifications for her termination were fabrications.

77. Ms. Borelli explained that she had never discussed pricing with Client 3, that the products discussion with Client 3 did not include disclosure of any inappropriate information regarding products, and that Ms. Borelli had already been communicating with Client 3 prior to Mr. Mullery sending out his priority list.

78. To support her assertions, Ms. Borelli attached the email correspondence that she had with Client 3, which clearly provided a broad overview of Sintetica and the products list that was already public information.

79. Ms. Borelli also described to Sintetica's corporate leadership that the need to have an NDA in place to discuss products was not standard operating procedure in the U.S., that she had never been informed of this requirement, and that this requirement was not in any of Sintetica US's standard operating procedures or current handbook.

80. Moreover, should such a requirement actually exist, Ms. Borelli provided documentation of instances when Mr. Mullery would have violated this requirement by sharing detailed information with third party companies about Sintetica and its products before the establishment of an NDA.

81. Ms. Borelli emphasized to Sintetica's corporate leadership that she believed she had been wrongfully terminated and expressed her regret that Sintetica had terminated her employment despite her excellent performance.

82. Sintetica continued to engage in retaliatory acts against Ms. Borelli even after her termination by threatening Ms. Borelli with legal action by way of an unwarranted cease-and-desist letter from Sintetica's counsel, which she received one day following her termination.

83. The following day, Sintetica sent Ms. Borelli a termination letter noting that she was terminated for sharing unauthorized proprietary and confidential information with a third party without prior authorization – a claim that Ms. Borelli had already disproven.

84. Approximately one hour later, Ms. Borelli was sent a formal cease-and-desist letter from Sintetica's counsel, which also stated that her March 4, 2024 email to Sintetica's corporate leadership contained "multiple baseless allegations regarding [her] termination…" despite the multitude of evidence that Ms. Borelli provided to substantiate the fact that the stated reasons for her termination were groundless.

85. Sintetica carried through on its groundless threats by filing suit against Ms. Borelli in the United States District Court for the District of New Jersey as further retaliation against Ms. Borelli for the concerns she raised prior to her wrongful termination. Sintetica did not serve the Complaint upon Ms. Borelli and ultimately, voluntarily dismissed its retaliatory Complaint without prejudice.

86. Evidence of a retaliatory animus is also demonstrated by the fact that Ms. Borelli was owed significant expense reimbursements that remained outstanding.

87. Based on the foregoing, Ms. Borelli maintains that she was wrongfully terminated in retaliation for her opposition to and expressed concerns regarding unethical and/or unlawful acts by Sintetica.

88. These wrongful acts of Sintetica resulted in extreme embarrassment, humiliation, and harm to Ms. Borelli's professional reputation and career.

89. Ms. Borelli has suffered significant financial losses, including lost wages and bonuses, as a direct and proximate result of the actions and inactions of the Defendants.

90. As a result of the Defendants' conduct described herein, Ms. Borelli has incurred a significant obligation for attorneys' fees and costs of bringing this action.

91. As a result of Defendants' conduct described herein, Ms. Borelli has suffered and continues to suffer significant emotional distress.

92. Defendants and their agents acted with knowledge of, or in reckless disregard of the probability that their actions and inactions would cause Ms. Borelli to suffer emotional distress.

93. Defendants' actions were intentional and willful and warrant the imposition of punitive damages.

## COUNT I
**New Jersey Conscientious Employee Protection Act, N.J.S.A. 34:19-1 et seq.**

94. Plaintiff Maureen Borelli repeats and incorporates by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

95. By objecting to the unethical or illegal activity of Defendants, Ms. Borelli complained in good faith about conduct and activity that she reasonably believed was a violation of law, rule or regulation promulgated pursuant to law, was fraudulent, and/or was in violation of standards of law enforcement and thus incompatible with a clear mandate of public policy concerning the public health, safety or welfare.

96. By the foregoing conduct, Defendants retaliated against Plaintiff for raising complaints and objections about activities, policies or practices that she reasonably believed constituted a violation of law, rule or regulation promulgated pursuant to law, were fraudulent, and/or were in violation of standards of academic honesty and thus incompatible with a clear mandate of public policy concerning the public health, safety or welfare.

97. Plaintiff's termination by Defendants was wrongful and violated the New Jersey Conscientious Employee Protection Act, N.J.S.A. 34:19-1 et seq., as a result of which, the Plaintiff sustained economic and non-economic damages.

98. The conduct of Defendants warrants an award of punitive damages as the willful participation of Defendants in the malicious decision to terminate Ms. Borelli justifies the imposition of punitive damages for the Defendants' reckless indifference to the rights of Plaintiff.

## COUNT II
**Wrongful Termination**

99. Plaintiff Maureen Borelli repeats and incorporates by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

12

100. Ms. Borelli opposed and refused to participate in unethical, illegal and/or unsafe activity engaged by Defendants, as alleged herein.

101. The activities Ms. Borelli observed and refused to engage in constituted breach of fiduciary duty, corporate waste, misuse of corporate and/or government funds, inappropriate and harassing behavior, violations of corporate governance, and violations of, among other laws, Title 18 § 4107 (deceptive or fraudulent business practices).

102. Defendants terminated Ms. Borelli in retaliation for her opposition to and refusal to engage in unethical, fraudulent and/or illegal activity in violation of New Jersey public policy.

103. The above-described conduct of Defendants, in terminating Ms. Borelli, represents wrongful termination pursuant to the common law of the State of New Jersey.

104. As the direct and proximate result of Defendants' wrongful termination of Ms. Borelli, Plaintiff has sustained a loss of earnings, severe emotional and psychological distress, loss of self-esteem, damage to her professional reputation and career, loss of future earning power, as well as back pay, front pay, and interest due thereon, and has incurred attorneys' fees and costs.

## **PRAYER FOR RELIEF**

105. Plaintiff Maureen Borelli repeats and incorporates by reference the allegations of all previous paragraphs as if fully set forth at length herein

**WHEREFORE,** Plaintiff Maureen Borelli respectfully requests that this Court enter judgment in his favor and against Defendants and Order:

a. Appropriate equitable relief;

b. Defendants to compensate Plaintiff with a rate of pay and other benefits and emoluments of employment to which she would have been entitled had she not been subjected to unlawful retaliation;

c. Defendants to compensate Plaintiff with the wages and other benefits and emoluments of employment lost because of their unlawful conduct;

d. Defendants to pay Plaintiff punitive damages;

e. Defendants pay Plaintiff liquidated damages;

f. Defendants to pay Plaintiff compensatory damages for future pecuniary losses, pain and suffering, inconvenience, mental anguish, loss of employment and other nonpecuniary losses as allowable;

g. Defendants to pay Plaintiff's costs of bringing this action and her attorneys' fees;

h. Plaintiff be granted any and all other remedies available pursuant to CEPA and New Jersey common law; and

i. Such other and further relief as is deemed just and proper.

## JURY DEMAND

Plaintiff hereby demands trial by jury as to all issues so triable.

Respectfully submitted,

BELL & BELL LLP

By: */s/ Christopher A. Macey, Jr.*
Christopher A. Macey, Jr., Esquire
Bell & Bell LLP
1617 John F. Kennedy Blvd. – Suite 1254
Philadelphia, PA 19103
(215) 569-2500

*Attorneys for Plaintiff Maureen Borelli*

DATED: February 28, 2025

14